## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Wave Form Systems, Inc.,

       Plaintiff,

   v.

AMS Sales Corporation and
American Medical Systems, Inc.,

       Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-3976 ADM/TNL

---

Karla M. Vehrs, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, appeared on behalf of Plaintiff.

Kirk W. Reilly, Esq., Gray Plant Mooty Mooty & Bennett, PA, Minneapolis, MN, appeared on behalf of Defendants.

---

## I.  INTRODUCTION

On December 5, 2014, the undersigned United States District Judge heard oral argument on Plaintiff Wave Form Systems, Inc.'s ("Wave Form") Motion for Preliminary Injunction [Docket No. 11] against Defendants AMS Sales Corporation and American Medical Systems, Inc. (collectively, "AMS").  For the reasons set forth below, Wave Form's motion is denied.

## II.  BACKGROUND

### A.  AMS

AMS is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.  Am. Compl. [Docket No. 10] ¶ 2; Answer Am. Compl. Countercl. [Docket No. 19] ¶ 2.  AMS markets health care solutions, including GreenLight lasers.  Rooney Decl. [Docket No. 22] ¶ 2.  The GreenLight laser is a self-contained unit designed to treat benign prostatic hyperplasia, an affliction of the prostate that impacts urine flow.  Id.  The GreenLight laser

procedure utilizes special, liquid-cooled fibers inserted through a cystoscope to deliver laser energy to rapidly heat and vaporize prostate tissue.  Id.  The procedure is designed to eliminate excess tissue and results in the restoration of normal urine flow in most patients.  Id.

Until 2012, AMS had two different methods of selling its GreenLight lasers; direct sales and through its network of Mobile Service Providers.  In its direct sales method, AMS sold GreenLight lasers to health care providers at specific hospitals, who stored the lasers on site for physicians to use for their scheduled appointments.  Id. ¶ 3  AMS provided technicians to assist physicians with use of the laser.  Id.  AMS also sold GreenLight lasers to a network of Mobile Service Providers.  Id. ¶ 4.  These providers supplied GreenLight lasers to physicians at their offices and clinics.  Id.  Unlike the direct sale model, Mobile Service Providers transported their lasers for procedures as needed to clinics and offices of its customers.  Id.  Mobile Service Providers also provided technicians to assist physicians with use of the laser.  Id.

**B.  Wave Form**

Wave Form is an Oregon corporation that supplies health care providers with laser equipment and services for medical procedures in over 30 states.  Watkins Decl. [Docket No. 15] ¶ 2.  Wave Form offers its services to physicians and hospitals within driving distance of its 40 offices and satellite locations across the country.  Id.

Wave Form first bought GreenLight lasers from AMS starting in 2002.  Id. ¶ 4.  To date, Wave Form has purchased over $1.4 million in GreenLight laser equipment, including over $530,000 in 2013 alone.  Id. ¶¶ 5, 11.  In 2013, Wave Form performed over 860 GreenLight procedures, a 28% increase over its 2012 numbers.  Id. ¶ 4.  At the hearing, Wave Form indicated GreenLight accounts for roughly 20% of the laser therapy procedures it provides.

Prior to 2012, Wave Form purchased the lasers and disposable fibers from AMS and occasionally called upon AMS for repairs and troubleshooting. Id. ¶ 6. Wave Form staff personally serviced the GreenLight lasers whenever possible, performing needed repairs and periodic maintenance. Id. ¶ 12. Wave Form would sometimes sign service contracts under AMS' "Certified Partners Plan," which covered repair parts and on-site service up to a certain cap per laser. Id.

## C. The 2012 Mobile Provider Agreement

In 2011 and early 2012, AMS restructured its GreenLight laser business to align its direct sales and Mobile Service Provider models. Rooney Decl. ¶ 5. To that end, AMS eliminated its sales representatives and no longer directly sold GreenLight technology to end users. Id. ¶ 6. At this time, AMS also required Mobile Service Providers to purchase a Post-Warranty Service Plan ("Service Plan") from AMS for each GreenLight laser it owned. Id. ¶ 8. AMS reasoned the Service Plan was necessary because the wear and tear of more frequent travel increased the likelihood of damage to the sensitive GreenLight lasers. Id. ¶ 7.

After AMS announced its new plan, Wave Form expressed interest in being a part of the mobile program. Id. ¶ 13. In early 2012, AMS representatives traveled to Oregon to make an in person presentation to Wave Form about its new plan. Id. ¶ 14. Some time later, a first draft of the proposed Mobile Provider Agreement ("MPA") was emailed from AMS in Minnesota to Wave Form in Oregon. Watkins Decl. ¶ 9. Eventually, an execution copy of the MPA was sent from AMS in Minneapolis to Oregon, where it was signed by Wave Form and returned to Minnesota, where it was signed by AMS. Id.

The MPA includes a number of provisions that are central to this lawsuit, such as the

3

required purchase of Service Plans, the establishment of non-competition obligations, and a

termination clause.  Article 6, Section 2, entitled "Service Plan Requirements," states:

> As part of AMS' quality assurance requirements, Mobile Provider shall be
> required to purchase from AMS and maintain a Post-Warranty Service Plan for all
> GreenLight XPS and HPS Equipment.  Mobile Provider is prohibited from
> providing service or service agreements, with respect to any Equipment, to third
> parties, including but not limited to Customers.

Am. Compl. Ex. A at 9.  Exhibit D of the MPA details the three Service Plans AMS offers.  Id.

at 25.  The Service Plans, designated "Bronze," "Gold," and "Platinum," are tiered according to

cost and the amount of services provided.  Bronze, for example, costs $6,000 per GreenLight

XPS laser per year and includes two annual preventative maintenance visits by AMS with all

repair parts included, telephone technical support from 6:00 AM to 5:00 PM, and a 10%

discount on parts required for separate corrective repairs.  Id.  The Platinum plan costs $11,000

annually for each GreenLight XPS laser and covers two annual preventative maintenance visits

by AMS, 24-hour telephone technical support, an uptime guarantee, unlimited on-site service,

included parts replacement, and more.  Id. at 26.

The MPA also establishes non-competition obligations on both AMS and Wave Form.

Specifically, Wave Form is prohibited from offering or providing alternative lasers if the

customer requests GreenLight lasers.  Wave Form also cannot design or manufacture laser

products or systems that compete with AMS products.  Id. at 5.  AMS is prohibited from selling

equipment or products directly to Wave Form customers.  Id.

The MPA also includes a choice of law provision designating Minnesota as the

governing law.  Id. at 16.  Finally, the MPA's Term and Termination clause states the MPA

4

expires on December 31, 2014, unless extended by mutual written agreement of the parties.  Id. at 10.

## D.  Events Subsequent to the Execution of the MPA

After the MPA was executed, the parties' business relationship began to sour. According to Wave Form, AMS started demanding detailed data for each GreenLight procedure it performed, including date, time, and physician and facility names.  Watkins Decl. ¶ 14. Further, AMS began accusing Wave Form of violating the MPA's non-competition clause by attempting to convert GreenLight customers to competing technology.  Id. ¶ 22.

Also around this time, Wave Form heard rumors that AMS intended to terminate many mobile providers at the end of 2014.  Id. ¶ 20.  More recently, two customers informed Wave Form that it will not be authorized to offer GreenLight services after December 31, 2014.  Id. ¶ 30.  Additionally, Wave Form learned that AMS has sold or provided GreenLight technology directly to customers, which, Wave Form claims violates the non-competition clause of the MPA.  Id. ¶ 31.

Wave Form filed suit, seeking a declaratory judgment that it is a franchisee under the Minnesota Franchise Act ("MFA") and that the MFA will be violated if AMS terminates or does not renew the MPA prior to or at the end of 2014.  Am. Compl. ¶¶ 37-49.  Wave Form also asserts that AMS violated the MPA's non-competition clause when it allegedly sold GreenLight technology directly to customers.[1]  Id. ¶¶ 50-53.

---

[1] AMS has counterclaimed, alleging Wave Form violated the MPA's non-competition clause by attempting to convert GreenLight customers to competing technology.  Answer Am. Compl. Countercl. ¶¶ 27-42.  AMS also alleges a violation of the implied covenant of good faith and fair dealing.  Id. ¶¶ 43-48.  Finally, AMS seeks a declaration that AMS is not a franchisor

On November 18, 2014, Wave Form moved for preliminary injunctive relief, seeking to enjoin AMS from ending its alleged franchise relationship on December 31, 2014 and for violating the non-compete clause in the MPA.

## III.  DISCUSSION

**A.  Preliminary Injunction Standard[2]**

A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  The court considers four factors in determining whether a preliminary injunction should issue:  (1)  the threat of irreparable harm to the movant in the absence of relief; (2) the balance between the harm alleged and the harm that the relief may cause the non-moving party; (3) the movant's likelihood of success on the merits; and (4) the public interest.  Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No single factor is determinative.  Id. at 113.  Instead, the court considers the particular circumstances of each case, with the focus on the primary question of whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  Id.

---

and Wave Form is not a franchisee under the MFA, and that the MPA expires on its own terms on December 31, 2014.  Id. at 26-27.

[2] As a threshold matter, Wave Form's claims that AMS has violated the MPA by breaching the non-competition clause is not a consideration in deciding whether to grant Wave Form preliminary injunctive relief.  Because the alleged violations of the non-competition clause have already occurred and an adequate remedy at law exists that can provide Wave Form relief, these claims do not provide support for a preliminary injunction.  See CDI Energy Servs., Inc. v. West River Pumps, Inc., 567 F.3d 398, 403 (8th Cir. 2009) (noting that preliminary injunctive relief is unavailable when the harm complained of has already occurred and an adequate remedy for that harm exists).

### 1. Irreparable Harm

Wave Form's argument concerning irreparable harm is based on the premise that its relationship with AMS qualifies as a franchise relationship under the MFA.  As discussed below in the likelihood of success on the merits section, this conclusion is far from clear.  Nevertheless, in considering whether Wave Form has been irreparably harmed, the Court will assume without deciding that Wave Form's relationship with AMS does qualify as a franchisee - franchisor relationship under the MFA.

Wave Form first argues that the MFA presumes irreparable harm to the franchisee when a franchisor has failed to register its franchise.  Wave Form additionally argues its reputation, goodwill, and customer relationships will suffer irreparable harm absent an injunction.  AMS responds that the MFA does not grant Wave Form a presumption of harm because an exemption to the MFA's registration requirement applies.  AMS also argues that Wave Form's claims of harm to goodwill and reputation are too speculative to satisfy the high burden needed for injunctive relief.

Irreparable harm is a threshold requirement for preliminary injunctive relief.  Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).  Threat of irreparable harm requires more than a possibility of remote future injury, it requires a presently existing actual threat of injury.  Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).  "Wholly speculative" harm will not justify injunctive relief.  Local Union No. 884, United Rubber Workers, Cork, Linoleum & Plastic Workers v. Bridgestone / Firestone, 61 F.3d 1347, 1355 (8th Cir. 1995).  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be

fully compensated through an award of damages." <u>Rogers Grp, Inc. v. City of Fayetteville, Ark.</u>, 629 F.3d 784, 789 (8th Cir. 2010) (quotations omitted).  "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." <u>United Healthcare Ins. Co. v. AdvancePCS</u>, 316 F.3d 737, 741 (8th Cir. 2002) (applying Minnesota law).

Wave Form correctly asserts the MFA grants a presumption of irreparable harm to a franchisee if its franchisor fails to register its franchise.  Minn. Stat. § 80C.14, subd. 1. However, Minn. Stat. § 80C.03(h) provides that the registration requirement is exempted when:

> [t]he offer or sale of a franchise to a resident of a foreign state, territory, or country who is neither domiciled in this state nor actually present in this state, if the franchise business is not to be operated wholly or partly in this state, and if the sale of this franchise is not in violation of any law of the foreign state, territory, or county concerned.

Minn. Stat. § 80C.03(h).  Here, AMS is exempt from registering because the alleged offer or sale to Wave From was to a resident that was neither domiciled nor actually present in Minnesota, Wave Form did not operate its business wholly or partly in Minnesota, and the sale did not violate any Oregon law.

Next, any harm resulting from lost or diverted profits caused by customers leaving Wave Form because it no longer offers GreenLight is not irreparable.  The financial harm incurred by Wave Form can be readily compensated with an award of money damages if it eventually prevails on the merits.  While Wave Form argues it will be difficult to establish evidentiary support for how much harm it suffered, the relative difficulty in proving damages does not alter the conclusion.  Because an adequate remedy at law exists, this damage is not irreparable.  <u>See</u> <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief

in the federal courts has always been irreparable harm and inadequacy of legal remedies").

Harm to reputation and goodwill, on the other hand, can form sufficient irreparable harm to grant a preliminary injunction. United Healthcare Ins. Co., 316 F.3d at 741. Wave Form claims it "has a reputation in the market as a top-quality provider of laser equipment [and is] extremely responsive." Fuchs Decl. [Docket No. 14] ¶ 3. Wave Form asserts their reputation will be damaged by the "questions in [customers'] minds as to what Wave Form did wrong to warrant being cut off by AMS." Id. ¶ 8. Wave Form has identified one customer who, after learning that AMS allegedly "cut[] off" Wave Form, "responded with serious concerns about Wave Form's partnership with the company and about its future capabilities." Watkins Decl. ¶ 35. Wave Form claims the number of concerned customers will increase as AMS informs customers of terminated mobile providers. See, i.e., id. Exs. 7, 8 (two letters AMS sent to GreenLight physicians informing them that their GreenLight provider was no longer authorized as a GreenLight distributor).

Similar claims were made in Watkins Inc. v. Lewis, No. Civ.02-3708, 2002 WL 31319491 (D. Minn. Oct. 11, 2002), aff'd, 346 F.3d 841 (8th Cir. 2003). In Watkins, the contract between a supplier and distributor was terminated, and the supplier contacted some of the distributor's customers to notify them of the contract's discontinuance. Id. at *1. The distributor sought a temporary restraining order asserting, among other things, that the supplier had no right to terminate the contract. Id. at *8. In support of its position, the distributor asserted the termination caused injury to their goodwill and customer relationships. Id. at *10. This injury was supported by evidence of a customer's "doubt and concern" due to "questions as

to what [the distributor] would have done to merit the alleged 'termination' by [the supplier]."
Id.  The distributor also asserted that "customers have expressed shock and raised questions
about why [the distributor was] terminated which is prejudicing the [distributor] whether they
sell [the supplier] product or any other product."  Id. at *11.  The request for injunctive relief
was denied because "[t]here is insufficient evidence to support a finding that the termination of
their [supplier] distributorship has had or will have any meaningful impact on the [supplier's]
ability to sell other product lines to these businesses."  Id.

       Similarly, Wave Form's evidence of irreparable harm to its reputation, goodwill, and
customer relationships is insufficient to warrant injunctive relief.  Wave Form's claims of harm
are anticipatory and primarily rest on one customer's expression of concern after learning about
AMS' likely termination of Wave Form.  Finally, Wave Form's claims of reputational harm are
belied by its ongoing opportunity to maintain and develop its allegedly robust reputation.  Wave
Form is able to continue to provide its "top-quality" service in its non-GreenLine laser treatment
services, which, according to Wave Form, constitute roughly 80% of the procedures Wave Form
provides.  This undercuts Wave Form's claim of irreparable harm.  The conclusion in Watkins is
appropriate here; Wave Form has not met its burden of showing irreparable harm.

       **2.  Likelihood of Success on the Merits**

       The second factor considers whether Wave Form will likely prevail on the merits.  "[A]n
injunction cannot issue if there is no chance of success on the merits."  Mid-Am. Real Estate Co.
v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted).  To demonstrate a
likelihood of success, Wave Form must show that it has a "fair chance of prevailing" on its

claims.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).

A key issue here is whether the MFA would be violated if the MPA expires according to its own terms on December 31, 2014 due to AMS' failure to provide the required notice of non-renewal prescribed by the MFA.  Obviously, The resolution of this issue hinges on whether the MFA applies.[3]  Wave Form first argues that the MFA applies because the conduct of the parties satisfies the MFA's scope of applicability; AMS' offer to sell originated from Minnesota and Wave Form's acceptance of that offer was received by AMS in Minnesota.  Next, Wave Form contends that the required Service Plans constitute a franchise fee, one of the three statutory requirements to be deemed a franchisee.  AMS counters by arguing that the MFA does not apply because Wave Form is an Oregon corporation that does not conduct any business in Minnesota. Therefore, according to AMS, broadly applying the MFA to parties like Wave Form runs contrary to the intentions of the MFA and has the potential to control the dealings of a broad group of out-of-state franchisees simply because an offer was dispensed from a putative franchisor in Minnesota.  AMS additionally argues that if the MFA does apply, the Service Plans do not constitute a franchisee fee because they have a reasonable business purpose.

### a.  The MFA is intended to Protect Franchisees Located in Minnesota

The scope of the MFA is set forth in Minn. Stat. § 80C.19.  Subdivision 1 states that the MFA applies to sales and offers to sell "when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this

---

[3] The MPA's lack of explicit language creating a franchise relationship does not entirely rebut Wave Form's position that the MPA created a franchise agreement.  See Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc., 830 F. Supp. 2d 697, 704 (explaining that Minnesota law allows franchise agreements to be implied).

state."  Minn. Stat. § 80C.19, subd. 1.  Subdivision 2 provides clarity by stating:  "[a]n offer to

sell or purchase is made in this state, whether or not either party is then present in this state,

when the offer originates from this state or is directed by the offeror to this state and received by

the offeree in this state."  Id., subd. 2.

Wave Form contends that Minn. Stat. § 80C.19 is satisfied in two ways.  First, Wave

Form argues the "originated from" language was met when AMS transmitted the MPA from its

office in Minnesota to Wave Form in Oregon.  Second, Wave Form argues that when it executed

and subsequently returned the MPA to AMS in Minnesota for its signature, the "received by the

offeree in this state" provision was satisfied.  Wave Form's position, while it is seemingly a fair

construction of the statutory language, fails to account for the MFA's territorial application that

was intended by the legislature.

The MFA "was adopted in 1973 as remedial legislation designed to protect potential

franchisees within Minnesota from unfair contracts and other prevalent and previously

unregulated abuses in a growing national franchise industry."  Clapp v. Peterson, 372 N.W.2d

585, 586 (Minn. 1982).   The Minnesota Supreme Court has determined that the legislative intent

behind the passage of the MFA was to protect Minnesota franchisees located within Minnesota.

See, e.g., Martin Investors, Inc. v. Vander Bie, 269, N.W.2d 868, 872 (Minn. 1978).  The

legislature reaffirmed this policy when it amended the MFA's anti-waiver provision in response

to Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 740 (8th Cir. 1989)

(en banc).[4]  See, Twin Cities Galleries v. Media Arts Group, Inc., 415 F. Supp. 2d 967, 974-75

---

[4] The anti-waiver provision of the MFA broadly acts to void anything in a contract that
explicitly waives compliance with a provision of the Act or that has the effect of waiving

(D. Minn. 2006) (detailing the circumstances surrounding the 1989 amendment), rev'd on other grounds, 476 F.3d 598 (8th Cir. 2007).  Since the amendment, Minnesota courts have re-affirmed the intent to protect Minnesotans.  Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 880 (Minn. App. 1995).  The tension between the language of the statute and what courts have deemed to be the legislative intent is apparent.

There is the scant precedential guidance that strengthens the position of either party. Wave Form cites to Candleman Corp. v. Farrow, No. 9802463, Bus. Franchise Guide (CCH) § 11,635 (D. Minn. Feb. 1, 1999), which states that the MFA applied "because: (1) Candleman's offer to sell the franchise to Farrow originated from Candleman's Minnesota offices; and (2) Farrow's acceptance of the offer was received by Candleman in Minnesota."  Id.  However, the opposite approach was taken in In re Northwest Exp. Reg'l Airlines, Inc., 228 B.R. 53 (Bankr. D. Me. 1998).  The argument that the MFA applied simply because an offer to sell was made in Minnesota was rejected because the franchisee was not located in Minnesota.  Id. at 59.  The Western District of Wisconsin has also weighed in on the issue, noting that "[e]ven without the choice of law provision, [the MFA] is inapplicable to defendants, who are not Minnesota residents and who operate a franchise territory entirely outside of Minnesota."  Novus Franchising, Inc. v. Superior Entrance Sys., Inc., No. 12-cv-204, 2012 WL 3542451, at *2 (W.D.

───────────────

compliance with a provision of the Act.  See Minn. Stat. § 80C.21.  Prior to Modern Computer, the anti-waiver provision did not explicitly include choice of law provisions.  See Minn. Stat. § 80C.21 (1988).  The Modern Computer case determined that the undeniable "policy in favor of offering franchisees in Minnesota remedies greater than those available under traditional common law" was insufficient to overpower the countervailing policy of honoring choice of law agreements.  Modern Computer, 871 F.2d at 740.  The Minnesota legislature amended the anti-waiver provision in response to Modern Computer.

Wis. Aug. 16, 2012).

Other jurisdictions have also grappled with the territorial applicability of their respective

franchise laws. While the statutory language and the legislative motivation do not perfectly

overlap with the MFA and Minnesota, it is nevertheless instructive. The Sixth Circuit, in

Highway Equip. Co. v. Caterpillar Inc., ruled that the Illinois Franchise Disclosure Act did not

apply between Caterpillar, an Illinois corporation, and Highway Equipment, a putative Ohio

franchisee. 908 F.2d 60 (6th Cir. 1990). The territorial restriction was justified in part by the

Illinois Legislature's intention to protect Illinois residents only. Id. at 63. This ruling was

consistent with the Sixth Cirtuit's holding in Bimel-Walroth Co. v. Raytheon Co., in which

Wisconsin franchise legislation did not apply to a franchisee-distributor in Ohio that had a

contract with a franchisor-manufacturer in Wisconsin even though the a choice of law provision

named Wisconsin law as controlling. 796 F.2d 840 (6th Cir. 1986).[5] In comparison, the Ninth

Circuit held that Washington's Franchise Investment Protection Act applied to a relationship

between a Washington franchisor and a California franchisee. See Red Lion Hotels Franchising,

Inc. v. MAK, LLC, 663 F.3d 1080 (9th Cir. 2011) ("We hold that FIPA [] applies to this dispute

even though the franchise is located outside Washington").

At present, whether Wave Form will likely succeed on the merits of its claim is uncertain.

The entirety of Wave Form's position rests on the applicability of the MFA. While a

construction of the language of the statute does support Wave Form's position, the Minnesota

---

[5] Notably, the Bimel-Walroth decision superseded Boatland, Inc. v. Brunswick Corp., 558 F.2d 818 (6th Cir. 1977), which held that Wisconsin's franchise legislation did apply between an Ohio dealership and a Wisconsin supplier because the parties' agreement stipulated to the use of Wisconsin substantive law in their dealings.

14

nexus with the factual predicate is very minimal.  Other than receiving an offer transmitted from

Minnesota and then remitting acceptance back to Minnesota, Wave Form has had no contact

with Minnesota.  Wave Form has never had a single sale in this state nor does it have any

physical presence here.  While Wave Form does conduct business in states outside of Oregon, it

is undisputed that Minnesota is not one of them.  To construe the MFA broadly enough to apply

here given the facts currently of record in this case is a stretch.

### b.  Whether Required Service Plans are Franchise Fees

If the MFA does apply—which, as discussed above, is certainly not clear—Wave Form

must satisfy the statutory requirements of a franchise, including the payment of a franchise fee.

Wave Form contends that the mandatory Service Plans imposed by the MPA constitute a

franchise fee as defined by the MFA.  AMS responds by arguing that the Service Plans are not

franchise fees because they are a reasonable business expense.

Before a franchise relationship can occur, the MFA requires three elements, including the

payment of a franchise fee.  Minn. Stat. § 80C.01 subd. 4(a)(1)(iii).[6]  The statute defines a

franchise fee as, in relevant part:

> [a]ny fee or charge that a franchisee or subfranchisor is required to pay or agrees
> to pay for the right to enter into a business or to continue a business under a
> franchise agreement, including, but not limited to, the payment either in lump sum
> or by installments of an initial capital investment fee, any fee or charges based

---

[6] The other two elements under the MFA are that the agreement between the parties must
be one "by which a franchisee is granted the right to engage in the business of offering or
distributing goods or services using the franchisor's trade name, trademark, service mark,
logotype, advertising, or other commercial symbol of related characteristics" and that the
franchise relationship involves a "community of interest" between the franchisor and franchisee
"in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise."
Minn. Stat. § 80C.01 subd. 4(a)(i)-(ii).  These elements are not at issue here.

upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services. . . .

Minn. Stat. § 80C.01 subd. 9.  Minnesota courts have given "Franchise Fee" a broad definition.  Unlimited Horizon Mktg., Inc. v. Precision Hub, Inc., 533 N.W.2d 63, 66 (Minn. Ct. App. 1995).

The "reasonableness" test advanced by AMS has been utilized to discern whether an alleged indirect franchise fee can fall within one of the enumerated exceptions to the definition.  See, e.g., Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 242 (Minn. Ct. App. 1998) (analyzing whether minimum purchase commitments were unreasonable and thus franchise fees).  Minimum purchase requirements, mandatory advertising fees, and more have avoided classification as a franchise fee because they were found to be reasonable and ordinary business expenses.  See Day Distrib. Co. v. Nantucket Allserve, Inc., No. 07-CV-1132, 2008 WL 2945442 at *5 (D. Minn. July 25, 2008) (providing a list of previous decisions that have applied a reasonableness standard to various types of required payments).

The authority on this issue has not directly addressed whether required service plans or product warranties can avoid being franchise fees if they have a reasonable business purpose.[7]  However, this question does not need to be resolved at this juncture. As was true for the threshold question of whether the MFA should be applied, the franchise fee question is similarly murky.  This, however, weighs in favor of denying the

---

[7] Both Wave Form and AMS offer justifications for concluding that the Service Plans are either reasonable or unreasonable.  Because it is unnecessary to presently conclude this issue, the Court declines to make any judgment at this time.

16

preliminary injunction.  See Pacific Equip. & Irrigation, Inc. v. Toro Co., 519 N.W.2d 911, 915 (Minn. Ct. App. 1994) ("[w]here the parties legitimately dispute whether a product distributor is actually a franchisee under the Minnesota Franchise Act, the district court is not required to grant a temporary injunction. . . .  If there is a close factual dispute which could go either way at a trial on the merits, a court should be reluctant to issue a preliminary injunction").

### c.  AMS did not Provide 180 Days Notice

Finally, if Wave Form is able to demonstrate that the MFA applies and that the Service Plans constitute a franchise fee, it will likely be able to show that AMS did not comply with the statutory requirements for not renewing the MPA beyond December 31, 2014.  See Minn. Stat. 80C.14, subd. 4.  AMS does not contest that it did not notify Wave Form of its intent not to renew the MPA at least 180 days in advance of the December 31, 2014 termination date.

### 3.  Balance of Harms

The next Dataphase factor is the balance between the irreparable harm to the movant, if any, and the injury granting an injunction will cause to the other interested parties.  Dataphase, 640 F.3d at 113.  Wave Form argues that AMS faces little, if any, harm if the MPA is extended beyond its stated termination date.  AMS responds by arguing that forcing two parties to "remain married" in an unsatisfactory business relationship constitutes harm.

The balance of harms tips in favor of AMS.  The root of Wave Form's harm grows from its anticipated termination of the MPA at the conclusion of 2014.  This end point, however, is an

17

explicit term in the MPA that Wave Form has known for some time was approaching.  Wave

Form has been aware for months of the very real likelihood that the MPA would terminate

according to its own terms.  Wave Form has had sufficient time to ready itself for a business

environment on January 1, 2015 that does not include its relationship with  AMS.

Wave Form argues that AMS may suffer only slight financial harm if the MPA is

extended.  AMS may actually receive some financial gain due to Wave Form remitting payment

for the required Service Plans for each GreenLight laser it owns.  However, this is effectively

counterbalanced by the harm of forcing the parties to remaining in an undesirable business

relationship, which is difficult to quantify but nevertheless is real.

### 4. Public Interest

The final <u>Dataphase</u> factor requires consideration of the public interest.  <u>Dataphase</u>, 640

F.2d at 114.  Both sides contend that the public interest favors their position.  Wave Form

contends preserving the status quo—keeping the parties contractually bound—favors granting

the injunction.  AMS argues the public interest favors preserving their version of the status quo,

which has the MPA expiring on its own terms at the end of the year.

The public interest factor slightly favors AMS.  Wave Form is requesting that the MFA

work to alter a contract term it agreed to when the MPA was executed in 2012.  The express

termination clause of the MPA will be honored and the parties' obligations to each other will end

on December 31, 2014.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**

that Wave Form Systems, Inc.'s Motion for Preliminary Injunction [Docket No. 11] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____ s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 22, 2014.